HERBERT PENROSE ET AL. FOR THEIR OWN USE AND BENEFIT AND FOR THE USE AND BENEFIT OF ALL OTHERS SIMILARLY SITUATED, RESPONDENTS, v. WALTER WHITACRE, AS TREASURER AND EX OFFICIO TAX RECEIVER IN AND FOR THE COUNTY OF LYON, STATE OF NEVADA, AND WALKER RIVER IRRIGATION DISTRICT, APPELLANTS.

No. 3367

December 30, 1942.                    132 P.(2d) 609.

*W. M. Kearney* and *Robert Taylor Adams,* both of Reno, for Appellant Walker River Irrigation District.

*Franklin H. Koehler,* of Yerington, for Appellant Walter Whitacre.

*John R. Ross,* of Carson City, for Respondents.

## OPINION

By the Court, TABER, J.:

In 1935, and for a number of years prior thereto, a large part of the lands in improvement district No. 2 of the Walker river irrigation district became more and more waterlogged until the growth of crops and pasture was seriously interfered with, and it was difficult or impossible for land owners in said improvement district to borrow money from the federal land bank.

There are four improvement districts in the Walker river irrigation district, and the board of directors of the latter acts as the board of directors of each of the improvement districts. For the sake of brevity, improvement district No. 2 will frequently be referred to herein as the improvement district, and the Walker river irrigation district as the irrigation district.

In 1935 a majority of the land owners and water users in the improvement district appealed to the board of directors of the irrigation district, asking that something be done in the way of drainage to relieve the waterlogged condition of the lands. The board sent a representative, Mr. Roy M. Whittaker, to confer with the engineer of the United States bureau of reclamation,

Mr. L. J. Foster. The latter told Mr. Whittaker that if the interested parties would furnish him with plans and specifications for a drainage canal, he would consider having the project constructed by the civilian conservation corps.

A majority of the land owners and water users in the improvement district then organized the Wabuska drainage association, which employed and paid a surveyor whose map showing the course of construction and amount of excavation to be done was submitted to Mr. Foster. He approved the project, and entered into an agreement with the irrigation district that if the latter would furnish and maintain the necessary excavator, the bureau of reclamation would have the work done by the C. C. C. It further appears that the bureau also agreed to and did furnish purchase orders for gasoline and oil, pay the salary of the dragline operator and the oiler, and furnish cement, culverts, and all other materials necessary for the construction of the drain.

The work was begun in December 1935 and continued until the bureau's funds were exhausted in March 1938. About nine miles of canal were constructed, in two segments, one in the southern, the other in the northern portion of the improvement district. The amount expended by the bureau in this work was approximately $30,000, while the irrigation district advanced only $3,681.30 in carrying out its part of the agreement. This $3,681.30 was taken from an irrigation district operation and maintenance general fund made up of moneys raised by assessments, and which is used for replacing washed-out dams and for other operation and maintenance purposes. When the work benefits the whole irrigation district, every user therein is assessed; when it benefits only certain users, the assessments are made upon their acreages only. The canal, as planned, was to be about eleven and one half miles in length. When the C. C. C. stopped work in March 1938 there were still two and one half miles between the southern

and northern segments which would have to be exca-
vated before the canal could be completed. Some repair
work has been done since March 1938, but no further
construction work. The trial court found that the lands
lying above, which have been drained by construction
of the southern segment of the canal, have been mate-
rially benefited by such drainage; that the lands lying
between the two segments of the canal have been injured
by the dumping of such drained water upon them; and
that the lands through or below which the northern seg-
ment of the canal was dug have not been materially
affected by said construction.

Improvement district No. 2 was organized originally
in 1924. In 1937, long after work on the canal had
begun, upon petition of a majority of the electors own-
ing a majority of the lands in said improvement district,
the board of directors of the irrigation district reformed
it, changed its boundaries, and initiated proceedings
looking to an adequate drainage system to be financed
by the issuance of certificates of indebtedness of the
newly organized improvement district. The change of
boundaries was based upon the idea of embracing in
the improvement district the lands and area which the
board of directors assumed had been benefited by the
partial construction of the canal, also those lands which
the board assumed would be benefited from future com-
pletion of the project.

On August 5, 1937, the engineer's report covering the
"proposed works and improvements" was approved, and
the board proceeded to apply to the State irrigation dis-
trict bond commission for its approval of the project,
cost of which was to be provided for by the issuance of
certificates of indebtedness in the aggregate amount
of $15,000. On December 22, 1937, the commission
approved the reorganization of the improvement dis-
trict and the proposed method of financing the drain-
age project. At the same time the commission ordered
that a special election be called. On January 5, 1938,

the board of directors of the irrigation district adopted a resolution authorizing the issuance of certificates of indebtedness of the improvement district in the principal amount of $10,000, subject to the approval of the qualified electors. A special election was ordered for February 5, 1938. At the election forty-six votes were cast for, and twenty-eight against, the proposed issuance of certificates of indebtedness. The proposition voted on failed, therefore, to receive the approval of two-thirds of the electors, as required by the statute, and so was defeated.

The foregoing proceedings and election were had and held pursuant to the provisions of sec. 8066 N. C. L. 1929, being sec. 49½ of the Nevada irrigation district act of 1919 (Stats. of Nevada, 1919, chap. 64, p. 84).

The special election having failed of its purpose, proceedings under said section 8066 were abandoned; but after construction work ceased in March 1938 a large number of the land owners and water users in the improvement district again appealed to the board of directors of the irrigation district, asking the board to take such other measures, if any, as would enable the improvement district to finance the completion of the drainage canal, provide for the payment of certain indebtedness already incurred, and cover future expense incident to the operation and maintenance of the project. In April 1938 said owners and users signed an agreement with the irrigation district (never signed by the latter), containing the following provisions:

"(a) District will use its excavator equipment at no cost for rental to the Owners in the prosecution of this work, and the Owners agree to pay for all equipment repairs, cable or necessary expenditures made by the district in the prosecution of this work.

"(b) District will make the necessary advances or negotiate a loan in behalf of the Owners in a sum not to exceed the amount of costs of improvements contemplated under this agreement, owners agreeing to repay

said sum, together with interest accrued thereon, and hereby expressly authorize District to assess all the land within Local Improvement District No. 2 in an aggregate amount sufficient to repay said advances or loan and accrued interest, upon the basis of owners' acres in the Local Improvement District No. 2.

"(c) The owners agree to an assessment of Ten Cents (10¢) per acre per year on all lands within said Local Improvement District No. 2 until full amount of advances made by Walker River Irrigation District are fully paid.

"(d) Owners hereby expressly agree to hold District free and harmless from all liability or loss by reason of the acts or any of the acts of the District in connection herewith."

On August 5, 1938, pursuant to said agreement, the board of directors of the irrigation district, acting as the board of directors of the improvement district, adopted a resolution purporting to empower the latter to incur an indebtedness in the aggregate sum of $8,000, to borrow that amount of money, to issue warrants to the lender and to levy assessments on the lands in said improvement district sufficient to redeem such warrants. Upon application by said board to the state board of irrigation district bond commissioners, the latter approved the foregoing resolution on August 31, 1938, and authorized the improvement district to borrow said amount of money, issue and deliver warrants therefor, and levy assessments against the lands in the improvement district sufficient to raise the money necessary to redeem and pay such warrants at their maturity. On September 7, 1938 the board of directors of the improvement district adopted a resolution authorizing said district to issue such warrants.

On July 5, 1939, pursuant to the foregoing proceedings, the board of directors of the irrigation district, purporting to act under the provisions of sec. 8038 N. C. L. 1929, being sec. 27 of the Nevada irrigation district act, fixed and levied a special assessment of 18

cents for and on each acre of land in said improvement district. This assessment was included in the 1939 assessment roll of the irrigation district, which was thereafter delivered to the auditor of Lyon County. That official incorporated it in the county assessment roll for 1939, which was then delivered to the clerk, treasurer and ex officio tax collector of said county. In the first week of November 1939 the tax collector mailed, to plaintiffs and other owners and users in said improvement district, tax statements showing taxes due to Lyon County and assessments due to the irrigation district, the latter including the 18-cent special assessment which had been levied against all the lands in the improvement district. The special assessment complained of in this case was the second in a series of such assessments levied and to be levied in the years 1938, 1939, 1940, and 1941, to raise said sum of $8,000.

Plaintiffs, claiming that said special assessment was wholly illegal and void, brought this action in the First judicial district court, Lyon County, praying that the collection of said assessment be perpetually enjoined. The trial court, by its judgment, granted the relief prayed for, except that as to four of the plaintiffs the action was dismissed for the reason that they had paid the 18-cent assessment. This appeal is from said judgment and from an order denying defendants motion for a new trial.

The money to be raised by the special assessment was to be used (1) to complete the construction of the drainage canal, (2) to repay the irrigation district the $3,681.30 it had advanced under its agreement with the reclamation bureau, and (3) for expense in operating and maintaining the project. Appellants contend that the proposed assessment is authorized by the provisions of the Nevada irrigation district act, and directs particular attention to secs. 10, 10a, 14, 17, 32, 49½, and 54; being, respectively, secs. 8017, 8018, 8025, 8028, 8045, 8066, and 8072.

Section 10 ( sec. 8017 N. C. L.) contains the following

provisions: "The board. of directors shall have power to manage and conduct the business and affairs of the district, to make and execute all necessary contracts. * * * Said board shall also have the right to acquire, either by purchase, condemnation, or other legal means, all lands, rights and other property necessary for the construction, use and supply, operation, maintenance, repair and improvement of the works of the district, including canals and works constructed and being constructed by private owners, lands for reservoirs for the storage of water, and all other works and appurtenances, either within or without the State of Nevada, and shall also have the right to acquire or contract for the delivery of electric power and electric-power or transmission lines; provided, that the board shall not have the power to acquire or contract for the construction or acquisition of electric-power or transmission lines at a cost exceeding the sum of fifteen thousand dollars without first calling a special election thereon as provided in this act. * * * The board may appropriate water in accordance with the law, and also construct the necessary dams, reservoirs, and works for the collection, storage, conservation and distribution of water for said district and for the drainage of the lands thereof, and do any and every lawful act necessary to be done in order to accomplish the things and purposes herein described."

Section 10a (sec. 8018 N. C. L.) reads: "The works of an irrigation district shall be held to include any drain or watercourse, any side, lateral, spur or branch ditch or drain, whether opened, covered or tiled, or any natural watercourse into which drains or ditches of the district may enter for the purpose of outlet, whether such watercourse is situated in or outside of the district. And to secure complete drainage of the lands within any irrigation district the board of directors is hereby vested with full power to widen, straighten or deepen any watercourse or remove any obstruction or rubbish therefrom, whether such watercourse is situated in, outside

of or below the district; and when it is necessary, straighten such natural watercourse by cutting a new channel upon other lands; the value of such lands to be occupied by such new channel, and damages, if any, made by such work may be ascertained or paid in the manner that is now or may hereafter be provided by any law providing for the exercise of the right of eminent domain in this state. The expenses of the work provided for in this section shall be paid from moneys arising from assessments upon lands within the district or in any lawful manner acquired."

Section 14 (sec. 8025 N. C. L.) : "The board of directors, or other officers of the district, shall have no power to incur any debt or liability whatever, either by issuing bonds or otherwise, in excess of the express provisions of this act, and any debt or liability incurred in excess of such express provisions shall be and remain absolutely void; provided, that for the purpose of organization, or for any of the purposes of this act, the board of directors may, at any time with the approval of the state board of irrigation district bond commissioners, incur an indebtedness not exceeding in the aggregate the sum of thirty thousand dollars, nor in any event to exceed $1 per acre, and may cause warrants of the district to issue therefor, bearing interest at six per cent per annum, and the directors shall have the right and power to levy an assessment of not to exceed one dollar ($1) per acre on all lands in said district for the payment of such expenses. Thereafter the directors shall have the right and power to levy an assessment, annually, in the absence of assessments therefor under any of the other provisions of this act of not to exceed twenty (20) cents per acre on all lands in said district for the payment of the ordinary and current expenses of the district, including the salaries of officers and other incidental expenses. Such assessments shall be collected as in this act provided for the collection of other assessments."

Section 17 (sec. 8028 N. C. L.), relating to assessments based on the apportionment of costs of certain works in proportion to the benefits which will accrue to each tract or subdivision, provides in part: "Whenever thereafter an assessment is made, either in lieu of bonds, or an annual assessment for raising the interest on bonds, or any portion of the principal, or the expenses of maintaining the property of the district, or any special assessment voted by the electors, it shall be spread upon the lands in the same proportion as the assessments of benefits, and the whole amount of the assessments of benefits shall equal the amount of bonds or other obligations authorized at the election last above mentioned; provided, always, that the benefits arising from the undertakings for which special assessments are made may be distributed equally over the lands, or especially apportioned, and that assessments or tolls and charges may be made or imposed as hereinafter provided, when coming within the designation of operation and maintenance charges, by way of a minimum stated charge per acre whether water is used or not, and a charge for water used in excess of the amount delivered for the minimum charge, or such other reasonable method of fixing or collecting the operation and maintenance charge as the board of directors may adopt. Where drainage works are to be constructed, benefits may be apportioned to higher lands which are or may be irrigated from a common source or combined sources and by the same system or combined systems of works not then actually requiring drainage by reason of the fact that their irrigation contributes, or will, if irrigated, contribute water which must be carried off or away from the lower lands."

Section 32 (sec. 8045 N. C. L.) reads in part: "The cost and expense of purchasing and acquiring property, and of constructing works to carry out the formulated plan or plans, whether for irrigation or drainage or both, or for the improvement or supplementing of existing works, except as otherwise provided herein, shall be

paid out of the construction fund. For the purpose of defraying the organization and current expense of the district, and of the care, operation, maintenance, management, repair, and necessary current improvement or replacement of existing works and property, including salaries and wages of officers and employees and other proper incidental expenditures, the board may fix rates of tolls or charges, and provide for the collection thereof by the district treasurer as operation and maintenance, or some like designation, or may levy assessments therefor, or for a portion thereof, collecting the balance as tolls or charges as aforesaid. In this relation provision may be made by the board for the fixing, levying and collection of a minimum, flat, or stated operation and maintenance assessment, toll, or charge per acre, whether water is used or not, and a further operation and maintenance toll or charge for water used in excess of the amount delivered for the minimum charge; or the board may adopt other reasonable methods of fixing and collecting the operation and maintenance charges. Assessments, tolls, and charges may be collected in advance, and the assessment aforesaid, and such tolls and charges, may be based upon an estimate of the operation and maintenance revenue required for the current or ensuing year; to be adjusted as near as may be from year to year."

Section $49\frac{1}{2}$ (sec. 8066 N. C. L.) contains the following provisions: "The board of directors may also provide for the construction of canals, ditches, laterals, dams, drains or other structures or improvements or the acquirement, replacement, consolidation or extension of the same, or the leasing, acquisition or construction of electrical transmission lines and accessory equipment, the benefits of which affect all or are limited to a portion of the district only, in the following manner: Upon the recommendation in writing by the district engineer, or upon a petition signed by a majority of the electors of the district owning land to be affected, or by electors representing at least one-half

of the total acreage to be affected by such a proposed local improvement, defining the boundaries thereof, and requesting the board of directors to undertake the carrying out of the same, the board of directors, if it approves the same, may form and designate such area as an improvement district for the purpose desired, and shall establish and define the boundaries thereof; and the board of directors further shall have power to prepare plans and estimates of the cost of such proposed improvement and to determine the manner in which the cost of such improvement shall be provided for, and for this purpose may propose the issuance of bonds, notes, or certificates of indebtedness payable by an assessment or otherwise on the property in the improvement district, bearing not more than six per cent (6%) per annum interest, interest payable semiannually, and in such amounts and maturing at such time or times, not exceeding twenty (20) years, as the board of directors may prescribe; such securities, whether bonds, notes or certificates of indebtedness, when issued, to be executed by the officers of the district in the manner prescribed in this act for the execution of bonds; and the board of directors of the district after the plan has been approved by the irrigation district bond commission as herein provided and the bond issue or other indebtedness has been authorized at the special election as provided, shall proceed to apportion the benefits therefor in the manner prescribed in this act. The board shall call a special election in the manner prescribed in this act for the calling of special elections and shall fix one or more polling places within the improvement district which is affected by such local improvement, at which special election there shall be submitted to the electors of the improvement district to be affected by such proposed improvement, and upon which lands benefits are to be apportioned, the question substantially in the following form: Shall the improvement of local improvement district No. ............ (briefly

describing it) be authorized and the indebtedness therefor, estimated in the sum of........................dollars, be incurred and paid in the manner following (briefly stating the method of payment, whether by bonds, notes, or certificates of indebtedness and the time or times of payment, together with the rate of interest) ? The election shall in all other respects, including the qualification to vote, be conducted in the manner prescribed in this act for the holding of elections within the district in so far as the same may be applicable. If two-thirds of the qualified electors voting at such special election vote in favor of such proposed local improvement and the incurring of the indebtedness therefor, the board of directors shall be authorized to carry out such proposed improvement, providing the proceedings are confirmed by the court as hereinafter prescribed. No special election shall be called for the purpose hereinbefore provided until after the proposed local improvement, together with the estimated cost thereof accompanied by a report of the district engineer, together with the proposed method of financing the same, shall have been submitted by the board of directors of the district to the irrigation district bond commission and by such commission approved."

This section goes on to provide for confirmation proceedings in the district court if the election carries by a two-thirds vote. It further provides for the issuance of bonds in the name of the improvement district, such bonds to be a lien upon the land included therein. It then proceeds as follows: "For the payment of interest and the redemption of said bonds, notes or certificates of indebtedness, the board of directors shall levy annual assessments for the amount of interest and the redemption of said bonds, notes or certificates of indebtedness upon the lands affected by said local improvement according to the apportionment of benefits, and the same shall be delivered to the secretary of the district and by him entered in the assessment book or books

thereof, and such assessment or assessments and the collection thereof shall thereafter take the same course as assessments of the district as in this act provided. * * * All the provisions of this act where applicable shall apply to such improvement districts."

Section 54 (sec. 8072 N. C. L.), as amended, Stats. of Nevada 1933, chap. 186, at pp. 279, 280 (N. C. L. Supp. 1931–1941, vol. 2, pp. 1149, 1150), provides in part as follows: "In addition to the powers with which irrigation districts are or may be vested under the laws of the state, irrigation districts shall have the following powers: To cooperate and contract with the United States under the federal reclamation act of June 17, 1902, and all acts amendatory thereof or supplementary thereto, or any other act of Congress heretofore or hereafter enacted authorizing or permitting such cooperation, and to cooperate and contract with the State of Nevada under any laws heretofore or hereafter enacted authorizing or permitting such cooperation, for purposes of construction of works, whether for irrigation or drainage, or both, or for the acquisition, purchase, extension, operation, or maintenance of constructed works, or for a water supply, electric power and transmission lines, or for the assumption as principal or guarantor of indebtedness to the United States on account of district lands or for the collection of moneys due the United States as fiscal agents or otherwise, * * *."

Respondents contend that the only lawful way for the improvement district to raise money for the purpose of completing the construction of the canal and repaying the $3,681.30 advanced by the irrigation district is by special election as provided for in sec. 49½ (sec. 8066 N. C. L. 1929) ; that two-thirds of the qualified electors voting at such election must vote in favor of raising money for said purposes before all the lands in the improvement district can be lawfully assessed therefor. Appellants claim that within the limits prescribed by

sec. 14 (sec. 8025 N. C. L. 1929), money for said purposes may lawfully be raised without a special election. This contention is based upon the sections (except 49½) heretofore quoted or quoted from, and upon the last sentence of said sec. 49½ which provides, as we have seen, that "All the provisions of this act where applicable shall apply to such improvement districts." The court is not called upon to go through all of the eighty sections of the irrigation district act and point out all of the provisions which are, and those which are not, applicable to improvement districts. What we are concerned with now is whether the provisions relied upon by appellants authorize the raising of money for the purposes mentioned, by the method initiated after two thirds of the electors of the improvement district had failed to vote in favor of the question submitted at the special election.

After the special election, the attempt to raise money under the provisions of sec. 49½ was abandoned; but this would not prevent the improvement district's pursuing another method for raising the money if authorized by the provisions of the irrigation district act. We think, however, that the lower court was right in holding that the money for completing the canal and repaying the $3,681.30 to the irrigation district could not be raised by the method under consideration on this appeal.

■■ The fact that sec. 14 of the irrigation district act (sec. 8025 N. C. L. 1929) and other provisions of said act relied on by appellants are worded in such manner as to make them applicable to irrigation districts, as a whole, is not of itself sufficient to justify a holding that such provisions do not also apply to improvement districts, because, though so worded, one or more of them could be applicable to improvement districts by virtue of the last sentence in said sec. 49½. The courts in each instance will endeavor to ascertain the true intent of the legislature, resolving any doubt in favor of what is reasonable, as against what is unreasonable.

In sec. 49½ the legislature has prescribed with certainty and in detail the method of raising money for the purposes under consideration in this case. In doing so, that body has provided that before such local improvements as constructing canals and drains can be lawfully made at the expense of all the lands in an improvement district, there must first be a special election at which two thirds of the qualified electors vote in favor of such proposed local improvement and the incurring of indebtedness therefor. In view of this legislation, expressly and specially applicable to improvement districts, it would seem unreasonable to attribute to the legislature an intent that money for such purposes can lawfully be raised, or indebtedness incurred, without the holding of such special election. Nor is it reasonable to think that the legislature would specially provide for an election in sec. 49½ if the board of directors could lawfully raise such money or incur such indebtedness by virtue of other provisions of the act.

Appellants contend that, under the provisions hereinbefore quoted from amended sec. 54 of the irrigation district act, the board of directors of the district had the power to enter into the contract with the reclamation bureau. A little further on in the act, however, we find that sec. 56 (sec. 8074 N. C. L. 1929) opens with the following words: "Any proposal to enter into a contract with the United States for the repayment of construction moneys, the cost of a water supply, the operation and maintenance of existing works, or the acquisition of property, and to issue bonds if any be proposed, shall be voted upon at an election wherein proceedings shall be had in so far as applicable in the manner provided in the case of the ordinary issuance of district bonds." When sec. 54 is read in connection with secs. 56 and 49½, it does not change the court's opinion that to raise money for the two purposes heretofore mentioned requires a special election before a special assessment to cover same may legally be levied on all the lands of the improvement district.

■ We do not hold that special elections are necessary in improvement districts for the purpose of raising money or incurring indebtedness for all purposes, such as, for example, operating and maintenance expenses; but repayment of the $3,681.30 advanced by the irrigation district, and the money proposed to be expended in completing the construction of the drainage canal do not, nor does either of them, properly come under that head. Nampa & Meridian Irrigation District v. Bond, 268 U. S. 50, 45 S. Ct. 383, 69 L. Ed. 843.

■ Nor does the court hold that a special election is necessary in case of emergency. Appellants maintain that an emergency existed at the time the agreement with the reclamation bureau was entered into. The emergency, according to them, arose not only out of the admittedly waterlogged condition of a large part of the lands in the improvement district, but also by reason of the alleged fact that the opportunity to have the canal constructed by the civilian conservation corps, mostly at government expense, had to be taken advantage of without delay, otherwise it would have been lost. It is clear that the waterlogging alone did not create an emergency, as this condition had existed for years, and though gradually increasing, nothing sudden or unexpected had taken place. With reference to federal help, Mr. Whittaker, called by the defendants, testified as follows:

"Q. Now, at the time this work was done, was there any question raised about whether the money would be available at a later date, or was it necessary to accept the proposal at that time, that is, the CCC and Reclamation money? A. We had to accept the job then or lose the help for at least that winter.

"Q. Was there anything said about the money being available later? Were they to use it for any other purpose if it were not used then? A. Our experience with the government was we had to take it when available or chances were we wouldn't get it at all, so we took it then."

The trial judge, in his written decision, said there was no evidence to support the claim that the assistance of the reclamation service in constructing the canal would have been lost had construction been delayed until the holding of a special election under the provisions of sec. 49½. If the evidence had shown that the improvement district was unable to finance the project, this fact, taken together with the others above mentioned, would have presented a stronger showing of emergency. McKinney v. Helms, 102 Ind. App. 348, 2 N. E. (2d) 800. The special election showed that two thirds of the qualified electors did not approve the idea of assessing all the lands of the improvement district for the purposes mentioned; but the record fails to show that the improvement district was unable to finance the drainage canal. So, while the proffered help of the reclamation bureau created an opportunity very advantageous to many of the land owners in the improvement district, it did not, either by itself or taken in connection with the waterlogged condition of the lands, constitute a legal emergency, justifying assessment of all the lands in the improvement district without first holding a special election.

Appellants contend that respondents have no standing in a court of equity, for the reason that they have one or more full, adequate, and complete remedies at law. Appellants say that respondents could and should have taken these matters up first with the board of correction under sec. 26 of the irrigation district act (sec. 8037 N. C. L. 1929). This section reads: "The board shall meet at its regular monthly meeting in August of each year to correct assessments and may at such meeting correct assessments so as to conform with the benefits apportioned as herein provided for to pay obligations incurred or make up deficiencies arising from any source, and also to apportion and distribute benefits and assessments by reason of additional land in the district becoming subject thereto, and the secretary

shall publish notice of such meeting for two weeks in a newspaper published in the county in which the district was organized. In the meantime the assessment book or books shall remain in the office of the secretary for the inspection of all parties interested. The board of directors, which is hereby constituted a board of correction for the purpose, shall meet and continue from day to day as long as may be necessary, not to exceed five days, exclusive of holidays, and may make such changes in said assessment book or books as may be necessary to have it conform to the facts. Within ten days after the close of said season the secretary of the board shall have the corrected assessment book or books completed."

Plaintiffs were not seeking to have the special assessment corrected, but to prevent the enforcement of an illegal and void assessment which the board of directors was without any authority to levy.

Appellants maintain that respondents could have paid the assessment under protest, then sued the district to recover the money so paid. They call attention to sec. 11 of the irrigation district act (sec. 8022 N. C. L. 1929), authorizing and empowering boards of directors of irrigation districts "to institute, maintain, and defend, in the name of the district, any and all actions and proceedings, suits at law, and in equity." The remedy suggested would not, in our opinion, be adequate in this case, wherein we are dealing with a void, not merely an irregular assessment. Under the express terms of the irrigation district act, a valid assessment would constitute a lien upon the land included in the improvement district. In the instant case the attempted enforcement of the illegal assessment would throw a cloud upon respondent's titles. In such a case, injunction is a proper remedy, and Wells, Fargo & Co. v. Dayton, 11 Nev. 161, is not an authority to the contrary. In that case the property involved was furniture, fixtures, and money secured by mortgage.

We have finally to consider appellants' contention that respondents are estopped from questioning the special assessment. It is asserted by appellants that before any work was done, plaintiffs and others, through committees and at meetings, had urged the board of directors to do something to relieve the waterlogged condition of their land and provide drainage. They point out that the local drainage association authorized and employed Mr. Parker to make the initial survey before any work was commenced. They argue further that the signatures on the petition of August 3, 1937, to extend the boundaries of the improvement district, and the signatures on the agreement of April 1938 show that the board relied on the urgings and promises of the water users to pay the expenses of such drainage over and above the amounts donated by the reclamation service. Appellants also claim that plaintiffs were benefited by the construction of the nine miles of canal and that they accepted said benefits prior to the levy of the special assessment in July 1939. They say that drain ditches sufficient to drain the lands, particularly those of plaintiffs, were completed and actually used by them for draining their lands. They also state that the $3,681.30, taken from the "operation and maintenance emergency fund," was advanced on the oral and written promises of many of the parties who received the benefits, to repay said money to the irrigation district. It is further pointed out that plaintiffs made no objections to the proposed assessment until November 1939, and that they took no action in opposition to it until that time. For the foregoing reasons appellants contend that the doctrine of equitable estoppel should be applied as the board, in expending said money, acted to its own disadvantage on the faith of the promises made by the water users.

Those who, including some of the plaintiffs, urged upon the board of directors before any work was done that some action be taken to relieve the waterlogged

lands, did not ask that any money be raised or indebtedness incurred without authorization by a special election. The agreement to provide for the preliminary survey, signed by many of the property holders in the Wabuska drainage district, including some of the plaintiffs, was simply a mutual agreement "to obligate ourselves share and share alike on a per acre basis for the cost of providing a survey to determine a course of a drain canal which the bureau of reclamation is to construct for the above mentioned district." That survey was made by Mr. Parker, and paid for by those who signed the agreement. The petition of August 3, 1937, signed, among others by some of the plaintiffs, expressly requested that a special election be called. As we have seen, it was called but failed to carry. The agreement of April 1938 signed, among others, by twelve of the plaintiffs, and agreeing to a 10-cent, not an 18-cent assessment, was signed after all the construction work had been done. After it was signed no further construction work was performed, nor was any further money advanced by the irrigation district, except small amounts for repairs. In entering into the agreement with the reclamation bureau, and levying the assessment of 1939 without calling a special election, the board of directors was proceeding in a manner which it considered authorized by the statutes; it was not relying upon any misrepresentations made by plaintiffs, nor was it misled to the detriment of the district by any conduct on their part. All the real facts were at all times known to the board.

Referring to the acceptance by plaintiffs, without protest or objection, of benefits resulting from the construction of nine miles of the canal, appellants do not specify the particular plaintiffs alleged to have been so benefited. The testimony conclusively shows that not all of the plaintiffs have been benefited. So, even if the court were disposed to hold that some plaintiffs are estopped by reason of acceptance of benefits, we are not informed in the briefs which plaintiffs they are.

462

█ But there are other reasons why plaintiffs should not be held to be estopped under the rule of estoppel by acceptance of benefits. In the first place, as we have already stated, the board of directors knew all the facts at all times. 31 C. J. S., Estoppel, sec. 109, p. 349, n. 14. It was not only equally well, but better informed than plaintiffs. 19 Am. Jur. 742, n. 6. Secondly, we find nothing in the record to bring this case within any of the exceptions to the general rule that the doctrine of estoppel has no application where a special assessment is void. Payette-Oregon Slope Irr. Dist. v. Coughanour, 162 Or. 458, 91 P.(2d) 526; 25 R. C. L. 177, n. 18, 178, n. 8, 179, 180, n. 18, 181, nn. 6, 7, 8; 31 C. J. S., Estoppel, sec. 63, p. 251, n. 17.

█ Regarding appellant's complaint that no objection was made, nor any action taken in opposition to the assessment until November 1939, it may be observed that it was more than two years after the agreement was entered into with the reclamation bureau and the work commenced before the electors of the improvement district were given an opportunity to approve or reject the question submitted at the special election; and it was not until the summer of 1939 that the assessment complained of was levied. Under these circumstances, particularly in view of the fact that the board exceeded its powers in levying the assessment without calling a special election, plaintiffs were not required to protest or take any action until the attempted enforcement of the illegal levy.

No prejudicial error appearing, the judgment and order appealed from are affirmed.